AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>JERRY WIMBLEY JR., and<br>ROMAN ISAIAH SMITH,<br><br>Defendants. | **LODGED**<br>CLERK, U.S. DISTRICT COURT<br>SEP 19 2024<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___rsm___ DEPUTY<br><br>2:24-mj-05706-DUTY<br><br>**FILED**<br>CLERK, U.S. DISTRICT COURT<br>9/19/2024<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___CGM___ DEPUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 9, 2024 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951 | Interference with Commerce by Threats or Violence |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Blake MacLearnsberry*
*Complainant's signature*

Blake MacLearnsberry, Special Agent  - ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    09/19/2024

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. A. Joel Richlin, U.S. Magistrate Judge
*Printed name and title*

AUSA:    G. Marmaro (x8500)

## **AFFIDAVIT**

I, Blake MacLearnsberry, being duly sworn, declare and
state as follows:

### I. **INTRODUCTION**

1.   I am a Special Agent with the Bureau of Alcohol,
Tobacco, Firearms and Explosives ("ATF") and have been so
employed since 2019.  Prior to being employed with the ATF, I
was an accountant for approximately six years working in both
public accounting and corporate accounting.  I have performed
reviews, compilations, tax preparation, internal audits, and
many other accounting tasks and am well versed in audit practice
and procedure, Internal Revenue Codes, and other taxation law.

2.   I graduated from the ATF's Special Agent Basic
Training and from the Department of Homeland Security's Criminal
Investigator Training Program.  I received training and have
experience in the trafficking of firearms and controlled
substances, including but not limited to the identification of
controlled substances and the use of coded language.  I also
received training in the fields of arson, explosives, home
invasions, murder-for-hire, and other violent crimes.

3.   I have investigated multiple arson and explosive
cases, as well as murder-for-hire, weapons trafficking,
narcotics trafficking, and other gang related and violent crime
cases, and written affidavits and warrants in furtherance of
such investigations.  I have also completed arson and explosive
investigation training at the ATF Academy in Glynco, Georgia.

## II. **PURPOSE OF AFFIDAVIT**

4.   This affidavit is made in support of a criminal complaints against, and arrest warrants for, Jerry WIMBLEY Jr.("WIMBLEY") and Roman Isaiah SMITH ("SMITH") for a violation 18 U.S.C. § 1951 (Interference with Commerce by Threats or Violence).

5.   This affidavit is also made in support of search warrants for the following:

      a.   The person of WIMBLEY, as described more fully in Attachment A-1; and

      b.   The person of SMITH, as described more fully in Attachment A-2.

6.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1951 (Interference with Commerce by Threats or Violence) (the "SUBJECT OFFENSE"), as described more fully in Attachment B.  Attachments A-1 and A-2 are incorporated herein by reference.

7.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    On February 9, 2024, Two Victims Are Robbed of $200,000 Following Withdrawal from Chase Bank in Palmdale; Victims Had Previously Attempted to Cash Worker's Compensation Check**

4.    According to reports made to local law enforcement, on January 31, 2024, victim 1 ("V1") and victim 2 ("V2") went to the Chase Bank located at 38042 47th Street East, Palmdale, CA in order to cash a worker's compensation check with a total value of approximately $315,301.  The victims were informed that the bank did not carry that much cash on hand and that they would have to wait a few days for the bank to order the cash. The victims deposited the cash into their bank account, and the bank informed the victims that once the bank had the cash on hand, they would call the victims and notify them that they could come withdraw it.

5.    In the following week, the victims went to Chase Bank branches twice and withdrew $10,000 each time.

6.    On February 8, 2024, the victims received a call from the Chase Bank located at 38042 47th Street East, Palmdale, CA (hereinafter the "Chase Bank"), that the bank had funds of $200,000 available for withdrawal.

7.    On February 9, 2024, at approximately 11:58 a.m., V1 and V2 went to the Chase Bank and withdrew the $200,000.  The victims were walking to their vehicle in the parking lot when they were robbed at gunpoint by two suspects.  During the

robbery, the suspects took a purse belonging to V1 which contained approximately $200,000 in cash, as well as a cell phone from V2. Following the robbery the suspects fled the scene in a 2022 blue Chevrolet Silverado truck bearing Texas license plate SLK8126.

**B.    Movements Prior to Robbery; WIMBLEY's DNA Recovered from Robbers' Car**

8.    On February 9, 2024, at approximately 7:56 a.m., a dark blue Chevrolet Silverado truck bearing Texas license plate SLK8126 (the "Target Vehicle") was spotted traveling southbound on a traffic camera near the intersection of Sierra Highway and Avenue J in Lancaster, CA.

9.    At approximately 7:57 a.m., the Target Vehicle was spotted traveling southbound on a traffic camera near the intersection of Sierra Highway and Avenue K in Lancaster, CA.

10.    At approximately 7:59 a.m., the Target Vehicle was spotted traveling southbound on a traffic camera near the intersection of Sierra Highway and Columbia Way in Lancaster, CA.

11.    At approximately 8:16 a.m., the Target Vehicle was spotted traveling eastbound on a traffic camera near the intersection of Palmdale Boulevard and 20th Street East in Palmdale, CA.

12.    At approximately 8:18 a.m., the Target Vehicle was spotted traveling eastbound on a traffic camera near the intersection of Palmdale Boulevard and 30th Street East in Palmdale, CA.

13.  At approximately 8:24 a.m., the Target Vehicle was spotted traveling eastbound on a traffic camera near the intersection of East Avenue R and 47th Street East in Palmdale, CA.

14.  At approximately 8:27 a.m., the Target Vehicle arrived in the parking lot near the Chase Bank.  Later registration checks for the Target Vehicle showed that it was a rental vehicle belonging to Enterprise Rent-A-Car.  Over the next approximately 3 hours and 30 minutes, the Target Vehicle moved multiple times within the parking lot surrounding the Chase Bank but stayed within close proximity to the bank the entire time.

15.  At approximately 9:36 a.m., the Target Vehicle moved positions within the parking lot and parked in close proximity to a vehicle belonging to the security guard at the Chase Bank. Shortly thereafter the Target Vehicle relocated within the parking lot.

16.  At approximately 10:30 a.m., the Target Vehicle was parked approximately 100 feet from the southeast corner of the Chase Bank.

17.  At approximately 11:04 a.m., the victims arrived at the Chase Bank and parked their vehicle on the east side of the bank. V1 sat down on the lobby couch while V2 met briefly with one of the bank tellers before joining V1 on the lobby couch.

18.  At approximately 11:07 a.m., security cameras outside the bank recorded the Target Vehicle moving from one location in the parking lot to a new location in the parking lot.

19.  At approximately 11:20 a.m., exterior bank security footage cameras captured the Target Vehicle driving past the bank through the east side of the parking lot, past the victims' vehicle, and then parking approximately 100 feet south of the bank entrance.  The Target Vehicle backed into a parking spot that had a direct view of the bank exit.

20.  At approximately 11:58 a.m., outside surveillance video recorded the victims exiting the bank.  As the victims walked out the bank door, surveillance footage also captured the Target Vehicle pull out of its parking spot and begin driving northbound at a high rate of speed through the parking lot, directly toward the victims' vehicle.  As the victims arrived at their vehicle, the Target Vehicle parked directly behind the victims' vehicle.  Two black males ("S1" and "S2"), armed with handguns, exited the front driver's side and front passenger side of the Target Vehicle.  The driver of the Target Vehicle ("S1") pointed a gun at V1 and took V1's purse, which contained approximately $200,000.  The passenger of the Target Vehicle ("S2") pointed a gun at V2 and took V2's cell phone.  S1 and S2 then returned to the Target Vehicle and fled the scene northbound.  The entire robbery lasted approximately 20 seconds.

21.  Following the robbery, the Target Vehicle was observed on traffic cameras fleeing the scene.  At approximately 4:20pm that same day, the Target Vehicle was found abandoned in the area of 37th Street East and Avenue H in the City of Lancaster. The Target Vehicle was swabbed for DNA.  Analysis of the DNA revealed that Jerry WIMBLEY Jr. had been inside the vehicle.

Additionally, a receipt for the purchase of a lighter was found in the vehicle.  The receipt was from "CVS Pharmacy" located at 38012 47th Street East, Palmdale, CA approximately 150 feet south of the Chase bank where the robbery occurred.  The receipt depicted that a "BIC Limited Lighter" was purchased on 02/09/24 at 10:03am.  Surveillance video from the Chase bank showed the Target vehicle parked at the CVS just prior to the robbery.  Additionally, surveillance video inside the CVS Pharmacy showed one of the suspects from the armed robbery entering the CVS Pharmacy at approximately 10:02am, at which time the suspect found and purchased the lighter.

**C.   Historic Cell Site for the Target Vehicle**

30.   Following the robbery, deputies from the Los Angeles County Sheriff's Department wrote a state warrant for the cell site location data for the Target Vehicle.  Historic Cell Site data showed that prior to driving to the Chase bank on the morning of February 9, 2024, the Target Vehicle was parked in the area outside the residence located at 543 West Avenue H13, Lancaster, CA 93534.  A DMV records search showed that WIMBLEY provided the address of 543 West Avenue H13, Lancaster, CA 93534 as being his home address.

**D.   Following the Robbery, WIMBLEY Appeared to Launder a Large Sum of Money at Commerce Casino**

23.   Following the armed robbery, law enforcement subpoenaed Commerce Casino, located in Commerce, California, for records concerning transactions made by WIMBLEY at the casino.

24.   Beginning on approximately February 10, 2024, and ending on approximately March 8, 2024, casino records showed that WIMBLEY purchased approximately $34,500.00 in gambling chips and cashed out approximately $168,700.00. During the aforementioned time frame, records indicate that WIMBLEY visited the casino eleven times. During five of the visits to the casino, WIMBLEY cashed out a total of approximately $89,700.00 without having purchased any chips during that visit. Based on my training and experience, WIMBLEY's activity is consistent with a concealment money laundering scheme.

**E.    Interview of a Witness Who Became a Confidential Informant**

31.   On July 25, 2024, law enforcement interviewed a witness to the robbery who agreed to become a Confidential Informant ("CI").[1]  During the interview, the CI stated the following:

32.   The CI stated that he/she did not know that WIMBLEY and SMITH were going to commit the robbery prior to February 9, 2024.  The CI identified "Siete" as being Roman Isaiah SMITH. The CI stated that Jasmine COLIN, a bank teller at the Chase Bank the day of the robbery, told the CI about the victims planning to withdraw the large amount of cash and that the CI spoke to SHAW about the victims being at the bank and pulling out the cash on the day of February 9, 2024.  The CI stated that

---

[1] The CI began cooperating with law enforcement after agents served a search warrant for a phone belonging to the CI.  The CI does not have any felony convictions and has been provided approximately $3,900 by agents for relocation to protect the CI's safety.

SHAW was with SMITH at the time of the conversation. The CI stated that prior to the robbery, Jasmines COLIN's boyfriend said that they should rob the victims. The CI stated that SHAW called the CI while the CI was on Facetime with another individual and asked the CI if the CI was still at work. The CI replied that he/she was at work and that the victims were sitting at the bank. The CI stated that he/she did give a description of the victims to SHAW. The CI stated that COLIN had told the CI who the victims were when they arrived at the bank and that COLIN joked with the CI when the victims arrived and said "dang, should I call my man" so that they could rob the victims. The CI stated that after the CI spoke with SHAW, SHAW presumably called WIMBLEY.[2] SHAW then called the CI back a few minutes later at which time the CI told SHAW that the CI was going to take a lunch break. SHAW asked the CI if the victims were still at the bank, to which the CI replied that they were still in the lobby waiting. The CI stated that he/she didn't think that SMITH and WIMBLEY were going to rob the victims nor did the CI realize at that time that the Target Vehicle which the CI had observed earlier in the parking lot was actually the vehicle that was going to be used for the robbery. The CI stated that it wasn't until after the robbery occurred that SHAW called the CI back and the CI told SHAW that the victims really actually did get robbed, to which SHAW replied, "I know." Then SHAW told the CI that that "Siete [SMITH] and them did it." The

---

[2] Call detail records for SHAW's phone confirmed that after the CI spoke with SHAW, SHAW placed a phone call to a number known to be used by WIMBLEY.

CI stated that the CI was on the phone with SHAW when COLIN told the CI that the victims going to withdrawal the cash. The CI said, regarding the robbers knowing the exact moment that the victims would be leaving the bank, that the CI told SHAW "I'm going to take my lunch. They (the victims) are leaving anyways." The CI said that SHAW had asked what kind of people were taking that much money out of the bank and that the CI told SHAW that they were an "old Mexican couple."

33. The CI stated that he/she knew that WIMBLEY and SMITH were dangerous individuals who had been involved in multiple homicides and that WIMBLEY and SMITH had threated to kill the CI if the CI ever went to law enforcement.

34. The CI also stated that the only people who knew the exact day that the victims would be coming to the bank to pick up the money would have been Jasmine COLIN and Juan Espitia, who was the bank manager. COLIN had told the CI on the day of the robbery that the money had been at the bank for a while and that the bank had been waiting for the victims to come pick it up. In fact, the money had been delivered to the bank on a day that the CI wasn't working and that the victims were originally supposed to pick up the money on the day it was delivered to the bank. The CI stated that he/she knew that WIMBLEY and SMITH were responsible for the robbery because they were best friends and that following the robbery SMITH and WIMBLEY disappeared. Normally the CI would see SMITH with SHAW, but following the robbery, SMITH and WIMBLEY were not around anymore. The CI stated that he/she was scared and wanted to tell the police what

happened when the CI learned about the robbery, however she couldn't because the CI was worried for his/her own life and for SHAW's life.  The CI stated that SHAW told SMITH not to threaten the CI, but that following that conversation, SMITH "Beat the shit out of her [SHAW]. Pregnant and all."[3]  The CI said that he/she was on a phone call with SHAW when he/she were threatened by SMITH.  The CI stated that SMITH was too smart to threaten the CI via a text message or social media.  The CI also stated that WIMBLEY was worried that the CI would provide information to law enforcement and therefore removed the CI from his [WIMBLEY's] Instagram account.  The CI reiterated that WIMBLEY and SMITH never tried to pay the CI to keep silent, and instead threated to kill the CI.

**F. The CI Recorded SMITH's Confession to the Robbery During Undercover Meetings with SMITH and SHAW**

35.  On August 14, 2024, at the direction of law enforcement, the CI met with SMITH and SHAW and discussed the February 9th robbery with them.  The CI was equipped with audio recording devices provided by law enforcement.  Based on my review of the recording device and my conversations with the CI, I learned the following:

36.  Prior to talking about the robbery, SHAW told the CI that WIMBLEY was growing increasingly more violent.  SHAW stated, "Poppa [WIMBLEY] was tripping the other night."  SHAW

---

[3] SHAW was approximately 7 months pregnant with SMITH's child when SMITH beat her.  Los Angeles County Sheriff responded to the domestic violence call and observed that SHAW had been badly beaten.  The CI was present when police arrived on the scene.

stated that WIMBLEY had been using narcotics and had threated multiple other individuals that the CI and SHAW knew, and while brandishing a gun had told one of the individuals, "I'm going to shoot you bitch."  SHAW stated to the CI, "Poppa [WIMBLEY] is going fucking delusional and crazy."

37.  Later, as directed by law enforcement, the CI played a voicemail in the presence of SHAW.  In the voicemail, the caller identified themselves as a Special Agent with the U.S. Department of Justice and informed the CI that they, the Special Agent, intended to interview the CI about a robbery that the CI had witnessed.  Upon hearing the voicemail, SHAW stated "Oh they're talking about Chase."  The CI told SHAW that law enforcement was trying to trace the money taken in the robbery to which SHAW responded, "That money is gone baby."  SHAW went on to explain that the only person who would have had money left was WIMBLEY and that law enforcement had previously searched his house and found a large amount of money.  SHAW stated that following the search of WIMBLEY's apartment in Inglewood, WIMBLEY had moved back up to the Palmdale area and had hired a private attorney to help him fight his criminal case.[4]  SHAW went on to discuss SMITH and WIMBLEY's extensive criminal activity, particularly that of WIMBLEY.  SHAW also stated that SMITH was likely to get arrested for carrying a firearm.  SHAW stated

---

[4] Agents confirmed that in March of 2024, Pasadena Police Department served a search warrant on WIMBLEY's apartment in Inglewood, California and seized thousands of dollars in cash as well a firearm and other evidence items including gambling chips from Commerce Casino.

regarding SMITH, "He be on some dumb shit, but when it comes to his crimes, he's not as dumb as Poppa [WIMBLEY]."

38.   Later that same day, the CI had a conversation with SMITH, during which the CI discussed with SMITH the February 9 robbery.  During the conversation with SMITH, the CI was equipped with audio recording equipment.  Based on my review of this recording, debriefing the CI following the meeting, and my personal observation while on surveillance during the meeting, I am aware of the following:

39.   The CI informed SMITH that the CI had been contacted by one of the employees at the bank and that the employee had told the CI that federal agents were investigating the robbery. The CI then played a voicemail for SMITH in which a federal agent informed the CI that the CI was wanted for questioning about the robbery that occurred on February 9th.  The CI informed SMITH that the CI had learned that law enforcement was trying to trace the money that was stollen.  SMITH told the CI that they had been "Washing that motherfucker. They [law enforcement] can't really trace money like that.  That could be in everybody's hands though, you feel me?"  SMITH told the CI that the only way law enforcement could trace money was if it was put into a bank account.  The CI asked SMITH if he had put any of the money in his bank account.  SMITH stated, "I don't got no bank account."  The CI asked if WIMBELY had put any money into his bank account.  SMITH answered, "No, Poppa [WIMBLEY] didn't put no money in his bank account himself.  He put money

in somebody else's bank account though.  But it was still already washed."

40.   The CI then informed SMITH that law enforcement had pulled fingerprints off the robbery victim's vehicle.  SMITH told the CI that, "Nobody touch the people car.  No, I didn't touch that. I promise to God Tata.  Nobody touched the door. I promise you.  They [the victims] was already outside.  You feel me?  The nigger was in the car on one side.  And the bitch was getting in.  As soon as the bitch got in I said, 'I'm a Blood bitch.  Give me the bag or I shoot you just like this.'  What am I going to have to touch the car for?  I didn't have any gloves on regardless.  On the Bloods."

### IV. <u>TRAINING AND EXPERIENCE ON ARMED ROBBERY OFFENSES</u>

41.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct robbery investigations, I am aware of the following:

42.   Persons who engage, participate, or are involved with robberies generally maintain records of their stolen merchandise items and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their digital devices.  It has been my experience that people who participate in robberies will keep the contact information of other co-conspirators or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

43.  Individuals involved in robberies frequently use their cell phones to coordinate with co-conspirators and to research robbery locations.  Cell phones, for example, may be used to set meeting locations, pick routes to the robberies, coordinate times, and recruit robbery crew members.

44.  Many people also keep mementos from their robberies, including digital photographs or recordings of themselves possessing stolen merchandise items from the respective business or individual from which the robbery occurred.  These photographs and recordings are often shared via social media, text messages, and over text message applications.

45.  Those who commit robberies often sell the stolen merchandise or keep it in their possession.  Correspondence between persons buying and selling stolen merchandise often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photographs of the stolen merchandise between the seller and the buyer, as well as negotiation of prices. In my experience, people who engage in sales of stolen property frequently use phone calls, e-mail, and text messages to communicate with each other regarding stolen merchandise that they sell or offer for sale.  In addition, it is common for individuals who engage in robberies to have photographs of the stolen merchandise they or other individuals working with them possess or their cellular phones and other digital devices as they frequently send these photos to each

other to boast of their stolen merchandise and/or to facilitate sales or transfers of the stolen merchandise.

      a.   Individuals who engage in robberies often use multiple digital devices to minimize the chance of being traced. Additionally, multiple digital devices are often used for communicating with lookout vehicles and other co-conspirators who engage in committing robberies.

### V.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

46.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

47. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

48.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress WIMBLEY's or SMITH's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of WIMBLEY's or SMITH's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

//

//

//

//

//

## VI. <u>CONCLUSION</u>

49.   For all the reasons described above, there is probable cause to believe that WIMBLEY and SMITH committed a violation of 18 U.S.C. § 1951 (Interference with Commerce by Threats or Violence).   Further, there is probable cause to believe that evidence of violations of the SUBJECT OFFENSE, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, the person of WIMBLEY, and the person of SMITH, as further described above and in Attachments A-1 and A-2 to this affidavit.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19th day of
September, 2024.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE